UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 9/4/2018

PETER LEVINE, :
    :
            Plaintiff, :
    :
    -against- :
    :
NANCY A. BERRYHILL, Acting Commissioner :
of the Social Security Administration, :
    :
            Defendant. :

17-cv-5024 (RWL)

**OPINION**

------------------------------------------------------------X

**ROBERT W. LEHRBURGER, UNITED STATES MAGISTRATE JUDGE.[1]**

Plaintiff Peter Levine, represented by counsel, commenced this action against

Defendant Commissioner of the Social Security Administration (the "Commissioner"),

pursuant to the Social Security Act (the "Act"), 42 U.S.C. § 405(g), seeking review of the

Commissioner's decision that Levine was not disabled. The parties have submitted a

joint stipulation, regarding their cross-motions for judgment on the pleadings, pursuant to

the Court's Order at Docket Number 8. For the reasons set forth below, Plaintiff's motion

is GRANTED and the Commissioner's motion is DENIED.

BACKGROUND

A.    Summary Of Claim And Procedural History

Levine claims disability due to Parkinson's disease. (*See* Administrative Record

("R.") at 68.) On April 24, 2014, he filed an application for disability insurance benefits

("DIB"), alleging disability beginning on September 1, 2007. (R. at 68.) On June 13, 2014,

the Social Security Administration (the "Administration") denied his claim, determining that

---

[1] The parties have consented to the jurisdiction of a Magistrate Judge for all purposes.

his condition was not disabling on any date through December 31, 2010 – the date on which Levine was last insured for disability benefits.  (R. at 73, 76-78.)  Levine subsequently requested a hearing by an Administrative Law Judge ("ALJ").  (R. at 79.)  A hearing took place on November 19, 2015, before ALJ Vincent M. Cascio.  (R. at 33.) Levine was represented by Counsel.  (R. at 37.)  On February 9, 2016, ALJ Cascio issued a decision finding Levine not disabled for the relevant time period.  (R. at 18-29.)  The Appeals Council denied Levine's request for review of the ALJ's decision on May 19, 2017, rendering it the final determination of the Commissioner.  (R. at 1-4.)

B.    Relevant Medical Evidence

Levine last met the insured status requirements of the Act on December 31, 2010. (R. at 23.)  Accordingly, as framed by Levine, "the issue [in] this case is whether or not the medical evidence shows that [he] was disabled prior to December 31, 2010."  (R. at 37.)  The Court's discussion of the relevant medical evidence in this case therefore is divided into two sections: (1) contemporaneous medical evidence (that is, records created on or prior to December 31, 2010) and (2) post-2010 medical evidence (that is, records created after December 31, 2010. that address Plaintiff's condition prior to that date).[2]

1.    Contemporaneous Medical Evidence

In or about 2007, Levine noticed that when he laid on his left side, the fourth and fifth digits of his left hand would become numb.  (R. at 194.)  Those two fingers also experienced a subtle tremor.  (R. at 194.)  Four to five years prior, Levine's wife had

---

[2] Additionally, the record contains medical records created after December 31, 2010 that address Levine's condition *after* that date.  (*See* R. at 224-46.)  Given that medical evidence from the time period post-dating December 31, 2010 is less relevant, the Court will not set forth the contents of these additional medical records here.

noticed subtle changes in his gait – specifically, that his left foot would sometimes get "stuck" and would not move as easily as the right. (R. at 194.) With regard to the numbness and tremor of Levine's fingers, an electromyography ("EMG") showed ulnar neuropathy, and he was evaluated for surgery to correct the problem. (R. at 194.) Levine did not pursue the surgical option, and, over the course of the following year, his left hand developed more difficulties. (R. at 194.) The tremor began to involve all five fingers, the left hand had fewer spontaneous movements, and the hand tended to stay in a flexed position. (R. at 194.) Overall, Levine's movements were slower. (R. at 194.) Levine decided to pursue the surgical option, which required a new EMG. (R. at 194-95.) Levine was taking Lamictal, Lexapro, Lactulose, Nadolol, and Tramdol. (R. at 195.) When the new EMG did not show evidence of a neuropathy, the neurologist suspected Parkinsonism and referred Levine to the Center for Parkinson's Disease and Other Movement Disorders in the Department of Neurology at Columbia University Medical Center (the "Center"). (R. at 195.)

On September 18, 2008, Levine visited Dr. Steven Frucht at the Center. (R. at 194.) Levine reported to Dr. Frucht that, although he worked as a dog groomer and required full use of both hands, the aforementioned symptoms had not "affected his work or life in any way." (R. at 195.) Levine had not had any falls or near falls. (R. at 195.) He had no difficulty swallowing. (R. at 195.) Dr. Frucht did note that Levine's facial expression was mildly hypomimic. (R. at 196.) He also noted that Levine had a high frequency low amplitude rest tremor of the left fingers. (R. at 196.) Specifically, the tremor "became apparent on finger nose finger testing, as the target was reached. The target however, was reached accurately." (R. at 196.) There was bradykinesia (slowness of

movement) on finger tapping and pronation and supination with the left hand. (R. at 196.)
Heel tapping was normal bilaterally. (R. at 196.) There was mildly increased tone in the
arms bilaterally – more prominent on the left. (R. at 196.) With legs dangling, Levine's
left foot occasionally inverted. (R. at 196.) Levine was able to rise out of a chair on his
own without using his hands. (R. at 196.) His gait was slightly slowed, with decreased
heel strike on the left and decreased arm swing on the left. (R. at 196.) A pull test was
negative. (R. at 196.)

Dr. Frucht ultimately diagnosed Levine with a left sided rest tremor, rigidity, and
bradykinesia consistent with a diagnosis of Parkinson's disease. (R. at 196.) Levine did
not "have signs or symptoms concerning for a Parkinson's plus syndrome such as falls,
orthostasis, square wave jerks or ataxia." (R. at 196.) Additionally, his "symptoms [were]
very mild and [were] not interfering with his functioning at work or at home." (R. at 196.)
Dr. Frucht noted that he would start treatment as soon as Levine's symptoms began to
interfere with his functioning. (R. at 196.)

On March 19, 2009, Levine visited the Neurological Institute at New York
Presbyterian Hospital. (R. at 211.) He did not feel that his left hand slowness had
appreciably changed since his previous visit. (R. at 211.) The attending physician noted
that Levine's mood and behavior remained stable on Lamictal, which Levine took in
connection with his history of mood and bipolar disorder. (R. at 193, 211.) The physician
also observed Levine's left hand tremor at rest, bradykinesia of the left hand, rigidity of
the left arm, and decrease in left arm swing. (R. at 211.) The physician assessed early
Parkinson's disease but noted that Levine had "remained quite stable" and did not require

symptomatic treatment at that time. (R. at 211.) Levine had recently broken his right wrist, which required surgical correction. (R. at 211.)

On July 30, 2009, Levine again visited New York Presbyterian Hospital. (R. at 197-200.) He indicated that, since his previous visit, he had developed or been diagnosed with depression or a similar condition and was taking Lexapro on a daily basis. (R. at 197.) Levine also had noticed a slight increase in his left hand tremor, and his wife expressed concern about increased left hand slowness. (R. at 200.) He stated, however, that these symptoms were "[n]ot affecting his work as a dog groomer." (R. at 200.) The attending physician's assessment regarding Levine's Parkinson's disease was that, "if he is worse, it is mild." (R. at 200.) Accordingly, the physician recommended continuing to delay treatment. (R. at 200.)

On December 17, 2009, Levine returned to New York Presbyterian Hospital for a follow-up appointment. (R. at 201-03.) He indicated that he continued to take Lexapro. (R. at 201.) He also informed the attending physician that he had been having increasing difficulty at work and that others were noticing and asking him what was wrong. (R. at 203.) The physician observed no tremor but noted that Levine's left hand stiffness and slowness were "definitely more prominent than [at the] last visit." (R. at 203.) The physician also noted that Levine's gait was slower and that there was a decrease in his left arm swing. (R. at 203.) The physician indicated that Levine's symptoms had progressed and merited treatment. (R. at 203.)

On September 23, 2010, Levine again visited New York Presbyterian Hospital. (R. at 212-14.) Dr. Frucht noted that in his previous visit, Levine's levodopa prescription had been increased from 300 mg to 600 mg per day. (R. at 214.) Levine reported no on-off

motor fluctuations and no dyskinesias (impairment of voluntary movement).  (R. at 214.)

Additionally, Levine reported improvement in his left-sided slowness and stiffness.  (R. at 214.)  His work performance remained stable, and his mood was good.  (R. at 214.)  Dr. Frucht observed slight diminution in Levine's left shoulder shrug and slightly increased tone in his left arm.  (R. at 214.)  There was no tremor, and Levine was able to rise easily from a seated position.  (R. at 214.)  Levine's arm swing was depressed on the left, and a pull test was negative.  (R. at 214.)  Dr. Frucht noted that Levine had responded well to the increase in his dose of levodopa and that Levine's medication regimen would be left unchanged.  (R. at 214.)

### 2. Post-2010 Medical Evidence

On July 16, 2014, in connection with Levine's application for disability benefits, Dr. Frucht completed a "Functional Capacity Assessment" questionnaire concerning his alleged impairments as they existed prior to December 31, 2010.[3]  (R. at 217-23.)  Dr. Frucht identified Levine's stiffness, slowness, and immobility as supporting his diagnosis of Parkinson's disease.  (R. at 217.)  Dr. Frucht indicated that Levine's symptoms included fatigue, balance problems, poor coordination, unstable walking, pain, and a shaking tremor.  (R. at 218.)  Dr. Frucht also responded "Yes" to the following questions on the assessment form:

---

[3] Although this document is signed and dated "7/16/16," it cannot have been prepared in July of 2016, as it then would post-date Levine's hearing and the ALJ's decision – both of which refer to the document.  Because a stamp in the top left corner of the document indicates it was faxed on July 21, 2014, and because the document indicates that the date of Levine's most recent semiannual exam was March 27, 2014, a reasonable inference can be made that the handwritten date contains a typographical error and that the document was actually prepared on July 16, 2014.

Prior to December 31st, 2010, did your patient have significant and persistent disorganization of motor function in two extremities resulting in sustained disturbance of gross and dexterous movement or gait and station?

Prior to December 31st, 2010, did your patient have significant reproducible fatigue of motor function with substantial muscle weakness on repetitive activity, demonstrated on physical examination, resulting from neurological dysfunction in areas of the central nervous system known to be pathologically involved by the degenerative process associated with your patient's condition?

Prior to December 31st, 2010, did your patient complain of a type of fatigue that is best described as lassitude rather than fatigue of motor function?

(R. at 218-19.)

In response to the first question, Dr. Frucht stated that Levine had been "employed in a physically demanding job." (R. at 218.) In response to the second question, Dr. Frucht specifically referred to the slowness and stiffness of Levine's hand and arm movements, along with rigidity. (R. at 218.) Dr. Frucht also noted that Levine had been prescribed Sinemet,[4] a side effect of which is fatigue. (R. at 219.) He further indicated that Levine's depression and anxiety affected his physical condition. (R. at 220.) Dr. Frucht noted that the earliest date for which his description of Levine's symptoms and limitations, as set forth in the questionnaire, would apply is "Spring 2009." (R. at 220.)

Dr. Frucht indicated that Levine's symptoms were severe enough to interfere with his attention and concentration frequently – meaning between one thirds and two thirds of an eight-hour day. (R. at 220.) Dr. Frucht additionally opined that Levine was capable of performing only low-stress jobs because Parkinson's disease patients have less functional reserve to deal with stress. (R. at 220.) Dr. Frucht opined that, had Levine

---

[4] Sinemet is a combination of carbidopa and levodopa for the treatment of Parkinson's disease and syndrome. *Sinemet-oral*, https://www.webmd.com/drugs/2/drug-6591/sinemet-oral/details (last visited Aug. 29, 2018).

been placed in a competitive work situation, he would have been capable of walking two city blocks without rest and would have been able to sit, stand, or walk for up to thirty minutes before needing to change position.  (R. at 221.)  In Dr. Frucht's opinion, Levine could sit, stand, and walk for a total of one hour in an eight-hour work day.  (R. at 221.)

According to Dr. Frucht, prior to December 31, 2010, Levine would have needed to take unscheduled twenty-minute breaks approximately six to eight times during an eight-hour work day.  (R. at 221.)  Levine also would have needed to lie down or rest for about twenty minutes at unpredictable intervals approximately two times per day.  (R. at 221.)  Dr. Frucht indicated that, prior to December 31, 2010, Levine would have been capable of occasionally lifting or carrying up to ten pounds – where "occasionally" means less than two thirds of an eight-hour day.  (R. at 222.)  He also indicated that Levine could "rarely/never" lift more than ten pounds.  (R. at 222.)  Dr. Frucht noted that, for the repetitive activity of grasping, turning, or twisting objects with one's hand, Levine would have been able to perform such an activity with his right hand 40% of the time during an eight-hour work day on a competitive job, and, with his left hand, 60% of the time.  (R. at 222.)  For the repetitive activity of fine manipulations with his fingers, Dr. Frucht noted that Levine would have been able to perform such an activity with his right hand 30% of the time and, with his left hand 50% of the time.  (R. at 222.)  For the repetitive activity of reaching (including overhead) with his arm, Dr. Frucht stated that Levine would have been able to perform such an activity with his right arm 20% of the time and, with his left arm 40% of the time.  (R. at 222.)  Finally, Dr. Frucht indicated that Levine's impairments were likely to produce "good days" and "bad days," that Levine was likely to be absent from work about twice a month as a result of his impairments or treatment, and that there were

no other limitations that would have affected his ability to work at a regular job on a sustained basis during the relevant time period. (R. 222-23.)

On May 9, 2016, several months after the ALJ issued his decision, Dr. Frucht submitted a letter in connection with Levine's appeal. Dr. Frucht sought to clarify that the use of the word mild in his treating notes was a way of characterizing the severity of Levine's Parkinson's disease symptoms, not as "a measure of the impairment of daily activities and the ability to do work." (R. at 250.) Dr. Frucht also stated that his prior statements regarding how Levine was responding to the medication were a "reflection of his medical exam and not of his work performance." (R. at 250.)

C. Levine's Testimony

During his November 19, 2015 hearing before the ALJ, Levine testified that he had worked as a metal trader for approximately twenty years, but when his employer was bought out, he decided to take a severance package and "pursue [his] own business, with less pressure." (R, at 44.) From 2005 through the hearing, Levine owned a dog grooming business. (R, at 41.) He testified that while this job was initially full time, his "capacity to keep up with the work started to diminish" in around 2006 or 2007. (R. at 41-42.) As of the hearing, he testified that he was working approximately two days per week for five hours. (R. at 42.)

Levine testified that between 2008 and 2010, his balance deteriorated and his tremors worsened. (R. at 48.) He stated that his Parkinson's disease had affected his walking in 2008, that his feet tended to "get stuck," and that he had a few falls. (R. at 48.) He did not require use of a cane during the relevant time period but took care to use railings and stated that "[s]teps became an issue." (R. at 48-49.) Levine testified that he

would have been able to walk one block before having to stop or rest during the relevant time period.  (R. at 49.)  He stated that his ability to get "down and up out of [a] chair was affected" but that "[o]nce [he] was sitting it was okay for a while."  (R. at 49.)  With regard to standing in place, Levine stated that he tended to wobble and lift one leg.  (R. at 49.) He testified that the heaviest weight he could have lifted comfortably was ten pounds because he was afraid of losing his balance and falling, and weight tended to pull him down.  (R. at 49.)  He had to walk up and down stairs "[v]ery slowly and carefully," and he fell down the stairs a few times.  (R. at 50.)  When standing, Levine would have been able to touch his toes as well as lift his arms over his head.  (R. at 50.)  He stated that he would have had difficulty picking up a coin from a table but would probably have been able to pick up a pen with some effort.  (R. at 50.)  He could close his hand but would not have been able to make a tight fist.  (R. at 51.)

He reported difficulty eating, as his tremor made it difficult to use utensils, and his Parkinson's disease caused him to choke even on liquids.  (R. at 53-54.)  He was able to use a computer, but his left hand would freeze frequently while typing.  (R. at 54.)  Levine's Parkinson's disease did not affect his ability to read or to follow the plots of television shows.  (R. at 55.)  It was "a little difficult" for Levine to go out socially and, although he joined a gym, that was too difficult for him, and he never went.  (R. at 55.)  Levine's energy levels fluctuated due to his Parkinson's medications, and he would need to take fifteen to thirty minute breaks during work to sit down and regain his composure.  (R. at 56.) Occasionally, Levine required assistance with his dog grooming work, and his wife and children would assist with lifting, holding, or washing a dog.  (R. at 57.)  However, they

did not assist Levine with the scissor use.  (R. at 57.)  Instead, Levine would groom the dog slowly and carefully.  (R. at 57.)

Levine was also being treated for depression both during and after the relevant time period.  (R. at 51.)  Levine was treated by a psychiatrist, Dr. Pepper, who prescribed him Lexapro and Lamictal, and he occasionally saw a therapist.  (R. at 51-52.)  Levine stated that the medication helped him.  (R. at 52.)  Levine testified that his depression would affect his mood, which could affect his attention span, but it had no impact on his social functioning.  (R. at 52-53.)

D.      The Commissioner's Decision

The ALJ determined that Levine last met the insured status requirements of the Act on December 31, 2010.  (R. at 23.)  The ALJ also found that Levine did not engage in substantial gainful activity during the period from his alleged onset date of September 1, 2007, through his last insured date of December 31, 2010.  (R. at 23.)  The ALJ found that Levine's depression did not "impose more than minimal limitation in mention functioning for a continuous twelve-month period" and, accordingly, it was non-severe. (R. at 23-24.)  The ALJ concluded that Levine's Parkinson's disease qualified as a severe impairment, but that he did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. § 404, subpt. P, app. 1 (the "Listings").  (R. at 23-24.)  After reviewing the record, the ALJ found that Levine, through the date last insured, retained the residual functional capacity ("RFC") to perform light work except that he could not climb ladders, ropes or scaffolds; could not balance and should avoid unprotected heights and exposure to hazardous

machinery. (R. at 24-28.) Accordingly, the ALJ found that Levine was not disabled through the date last insured. (R. at 28-29.)

APPLICABLE LAW

A.    Standard Of Review

The court's review of an appeal of a denial of disability benefits requires two levels of inquiry. *Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987). First, the court must determine whether the Commissioner applied the correct legal principles in reaching a decision. 42 U.S.C. § 405(g); *Tejada v. Apfel*, 167 F.3d 770, 773 (2d Cir. 1999). Second, the court must decide whether the Commissioner's decision is supported by substantial evidence in the record. *Id.* So long as they are supported by substantial evidence in the administrative record, the findings of the ALJ after a hearing as to any facts are conclusive. 42 U.S.C. § 405(g).

An ALJ's failure to apply the correct legal standard constitutes reversible error if that failure might have affected the disposition of the case. *Kohler v. Astrue*, 546 F.3d 260, 265 (2d Cir. 2008). This applies to an ALJ's failure to follow an applicable statutory provision, regulation, or Social Security Ruling ("SSR"). *See, e.g.*, *id.* (regulation); *Schaal v. Callahan*, 993 F. Supp. 85, 93 (D. Conn. 1997) (SSR). In such a case, the court may remand the matter to the Commissioner especially if deemed necessary to allow the ALJ to develop a full and fair record to explain his or her reasoning. *Crysler v. Astrue*, 563 F. Supp. 2d 418, 429 (N.D.N.Y 2008).

If the reviewing court is satisfied that the ALJ applied correct legal standards, then the court must "conduct a plenary review of the administrative record to determine if there is substantial evidence, considering the record as a whole, to support the Commissioner's

decision." *Brault v. Social Security Administration Commissioner*, 683 F.3d 443, 447 (2d Cir. 2012) (*per curiam*) (quoting *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009)). Thus, the court does not determine *de novo* whether a claimant is disabled. *Id.* The Supreme Court has defined substantial evidence as requiring "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). Pursuant to the substantial evidence standard, a reviewing court may reject an ALJ's findings of fact "only if a reasonable factfinder would have to conclude otherwise." *Brault*, 683 F.3d at 448 (emphasis omitted) (quoting *Warren v. Shalala*, 29 F.3d 1287, 1290 (8th Cir. 1994)).

To be supported by substantial evidence, the ALJ's decision must be based on consideration of "all evidence available in [the claimant]'s case record." 42 U.S.C. § 423(d)(5)(B). The Act requires the ALJ to set forth "a discussion of the evidence" and the "reasons upon which [the decision] is based." 42 U.S.C. § 405(b)(1). While the ALJ's decision need not "mention[] every item of testimony presented," *Mongeur v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983) (*per curiam*), or "reconcile explicitly every conflicting shred of medical testimony," *Zabala v. Astrue*, 595 F.3d 402, 410 (2d Cir. 2010) (quoting *Fiorello v. Heckler*, 725 F.2d 174, 176 (2d Cir. 1983)), the ALJ may not ignore or mischaracterize evidence of a person's alleged disability. *See Ericksson v. Commissioner of Social Security*, 557 F.3d 79, 82-84 (2d Cir. 2009) (mischaracterizing evidence); *Kohler*, 546 F.3d at 268-69 (overlooking and mischaracterizing evidence); *Ruiz v. Barnhart*, No. 01 Civ. 1120, 2002 WL 826812, at *6 (S.D.N.Y. May 1, 2002) (ignoring evidence).

If the decision denying benefits applied the correct legal standards and is based on substantial evidence, the reviewing court must affirm; if not, the court may modify or reverse the decision, with or without remand. 42 U.S.C. § 405(g).

B.   Legal Principles Applicable To Disability Determinations

Under the Social Security Act, every individual considered to have a "disability" is entitled to disability insurance benefits. 42 U.S.C. § 423(a)(1). The Act defines "disability" as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). A claimant's impairments must be "of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).

To determine whether an individual is entitled to receive disability benefits, the Commissioner is required to conduct the following five-step inquiry. First, the Commissioner must determine whether the claimant is currently engaged in any substantial gainful activity. 20 C.F.R. § 404.1520(a)(4)(i). Second, if he is not not gainfully engaged in any activity, the Commissioner must determine whether the claimant has a "severe impairment" that significantly limits the claimant's ability to do basic work activities. Under the applicable regulations, an impairment or combination of impairments that significantly limits the claimant's ability to perform basic work activities is considered "severe." 20 C.F.R. § 404.1520(c)(a)(4)(ii). Third, if the claimant has a "severe impairment," the Commissioner must determine whether the impairment is one of those

included in the Listings of the regulations – if it is, the Commissioner will presume the claimant to be disabled and the claimant will be eligible for benefits. 20 C.F.R. § 404.1520(c)(a)(4)(iii).

After step three, but before step four, the Commissioner also must determine the claimant's RFC; that is, the claimant's ability to perform physical and mental work activities on a sustained basis despite his impairments.[5] 20 C.F.R. § 404.1520(e). At step four, if the claimant does not meet the criteria for being presumed disabled, the Commissioner next must determine whether the claimant possesses the RFC to perform the claimant's past work. 20 C.F.R. § 404.1520(a)(4)(iv). Fifth, if the claimant is not capable of performing prior work, the Commissioner must determine whether the claimant is capable of performing other work. 20 C.F.R. § 404.1520. The claimant bears the burden of proof at the first four steps. *Selian v. Astrue*, 708 F.3d 409, 418 (2d Cir. 2013). Once the claimant has established that they are unable to perform their past work, however, the Commissioner has the burden of showing that "there is other gainful work in the national economy which the claimant could perform." *Balsamo v. Chater*, 142 F.3d 75, 80 (2d Cir. 1998) (quoting *Carroll v. Secretary of Health and Human Services*, 705 F.2d 638, 642 (2d Cir. 1983)).

DISCUSSION

Levine argues that the ALJ's decision should be reversed or remanded on several grounds. First, Levine contends that the ALJ failed to give proper weight to the opinion of the treating physician, failed to properly develop the record related to the physician's

---

[5] A claimant's residual functional capacity is "the most [he] can still do despite [his] limitations." 20 C.F.R. § 404.1545(a).

opinion, and then impermissibly substituted his own lay opinions for that of the physician. Levine further argues the ALJ failed to consider all of Levine's impairments, specifically, his fatigue. Finally, Levine argues that the ALJ failed to properly analyze Levine's credibility. The Court finds that the ALJ improperly rejected the treating physician's opinion and substituted his own opinion for the medical doctor's opinion. Accordingly, remand is warranted.

A.    The ALJ Improperly Accorded the Treating Physician's Opinion Little Weight

1.    The Treating Physician Rule

In considering the evidence in the record, the ALJ must give deference to the opinions of a claimant's treating physicians. A treating physician's opinion will be given controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case record." 20 C.F.R. § 404.1527(c)(2); *accord Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002).

The ALJ must give "good reasons" for declining to afford a treating physician's opinion controlling weight. 20 C.F.R. § 404.1527(c)(2); *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999). Before an ALJ can give a treating physician's opinion less than controlling weight, the ALJ must consider various factors to determine the amount of weight the opinion should be given, including: (1) the length of the treatment relationship and the frequency of examination, (2) the nature and extent of the treatment relationship, (3) the medical support for the treating physician's opinion, (4) the consistency of the opinion with the record as a whole, (5) the physician's level of specialization in the area, and (6) other factors that tend to support or contradict the opinion. 20 C.F.R. § 404.1527(c)(2)-

(6); *Schisler v. Sullivan*, 3 F.3d 563, 567 (2d Cir. 1993). ALJs must then "comprehensively set forth [their] reasons for the weight assigned to a treating physician's opinion." *Monroe*, 676 F. App'x at 7 (quoting *Burgess v. Astrue*, 537 F.3d 117, 129 (2d Cir. 2008)). However, the ALJ need not "slavish[ly] recit[e] [ ] each and every factor where the ALJ's reasoning and adherence to the regulation are clear." *Atwater v. Astrue*, 512 F. App'x 67, 70 (2d Cir. 2013).

While the ALJ is free to resolve issues of credibility and choose between conflicting, properly submitted, medical opinions, he cannot substitute his own judgment for a competent medical opinion. *Balsamo*, 142 F.3d at 81. Accordingly, a treating physician's opinion may not be rejected "solely on the basis that the opinions allegedly conflicted with the physician's own clinical findings." *Id.* at 80; *see also Griffel v. Berryhill*, No. 16 CV 1772, 2017 WL 4286254, at *9 n.10 (E.D.N.Y. Sept. 26, 2017) ("To the extent the ALJ rejected [the treating source]'s opinions on the basis that [the treating source]'s '[m]ental status examinations consistently demonstrate[d] normal to mild cognitive symptoms,' such rejection was erroneous because the ALJ may only reject [the treating source]'s opinions based on contradictory medical opinions, not based on the ALJ's interpretation of [the claimaint]'s medical records."); *Raja v. Astrue*, No. 11 Civ. 3490, 2012 WL 1887131, at *9 (S.D.N.Y. May 23, 2012) (ALJ improperly discounted treating physicians' opinions on the basis of conflicting medical records, rather than conflicting medical opinions).

2.     The ALJ's Duty to Develop the Record

In Social Security proceedings, the ALJ must also affirmatively develop the record on behalf of all claimants. *See Moran*, 569 F.3d at 112. As part of this duty, the ALJ must

investigate the facts and develop the arguments both for and against granting benefits. *Id.* Specifically, under the applicable regulations, the ALJ is required to develop a claimant's "complete medical history." *Pratts*, 94 F.3d at 37 (citing 20 C.F.R. § 404.1512(d)-(f)). This responsibility "encompasses not only the duty to obtain a claimant's medical records and reports, but also the duty to question the claimant adequately about any subjective complaints and the impact of the claimant's impairments on the claimant's functional capacity." *Pena v. Astrue*, No. 07 Civ. 11099, 2008 WL 5111317, at *8 (S.D.N.Y. Dec. 3, 2008).

Where there is a conflict or inconsistency in the record, the ALJ "bears an affirmative duty to seek out more information from the treating physician and to develop the administrative record accordingly." *Hynes v. Astrue*, No. 12 CV 719, 2013 WL 3244825, at *11 (E.D.N.Y. June 26, 2013) (quoting *Hartnett v. Apfel*, 21 F. Supp. 2d 217, 221 (E.D.N.Y. 1998)); *accord Rodriguez v. Berryhill,* No. 16 Civ. 9951, 2018 WL 1508739, at *4 (S.D.N.Y. March 27, 2018) (finding that there was enough "contradictory evidence" to "trigger the ALJ's duty to seek clarification and develop the administrative record before discounting the opinion of the treating physician").

Remand is appropriate where the ALJ's duty to develop the record is not discharged. *See, e.g.*, *Moran*, 569 F.3d at 114-15 ("We vacate not because the ALJ's decision was not supported by substantial evidence but because the ALJ should have developed a more comprehensive record before making his decision.").

3.    <u>Analysis of the ALJ's Treatment of the Treating Physician's Opinion</u>

The ALJ gave "little weight" to the opinion of Levine's treating neurologist, Dr. Frucht. (R. at 28.) Levine argues that this violated the treating physician rule. The Court agrees.

The ALJ gave Dr. Frucht's opinion little weight because he found it was not consistent with other evidence in the record; primarily Dr. Frucht's clinical notes from his treatment of Levine between 2008 and 2010. (R. at 28.) The ALJ also observed that Dr. Frucht's opinion was inconsistent with the clinical notes and records from the doctors who treated Levine from 2012 through 2016.[6] (R. at 28.) Even assuming that the ALJ could rely upon medical records that post-date the relevant time window, those records – as opposed to opinions – are not a sufficient basis upon which to reject the opinion of a treating physician. *See, e.g.*, *Rolon v. Commissioner of Social Security*, 994 F. Supp. 2d 496, 509 (S.D.N.Y. 2014) ("[S]ince the ALJ 'did not cite *any* medical opinion to dispute the treating physician['s] conclusions'. . . the ALJ did not provide good reasons as required by the treating physician rule." (citations omitted) (first alteration in original) (quoting *Balsamo*, 142 F.3d at 81)); *Raja*, 2012 WL 1887131, at *9; (opinions of the treating physicians should have been given controlling weight where they were only discounted on the basis of inconsistencies with prior medical tests); *Borus v. Astrue*, No. 09 Civ. 4723, 2011 WL 1453787, at *9 (S.D.N.Y. Apr. 13, 2011) (decision not supported by substantial evidence where the ALJ rejected the opinion of a treating physician based on inconsistencies with the physician's clinical findings), *report and recommendation adopted by* 2011 WL 2574395 (S.D.N.Y. June 24, 2011).

In light of the internal inconsistencies identified by the ALJ, he had an "affirmative duty" to seek out additional information, either by recontacting the treating physician or by obtaining an independent medical expert's opinion. *Hynes*, 2013 WL 3244825, at *11

---

[6] During this time period, in addition to continuing to receive treatment from Dr. Frucht, Levine was treated by Dr. Sanjeev Taneja, Dr. Florence Chang, and Dr. Amar Patel. (R. at 224-49.)

(quoting *Hartnett*, 21 F. Supp. 2d at 221); *see also Torres v. Commissioner of Social Security*, No. 13 Civ. 730, 2014 WL 406933, at *5 (S.D.N.Y. Feb. 3, 2014) (faced with inconsistencies between a treating physician's reports and opinion, the ALJ had an affirmative duty to develop the record).

The ALJ did not satisfy this duty. And in the absence of any other medical opinions in the record, the ALJ improperly relied upon his own interpretation of the various clinical notes to discredit Dr. Frucht's opinion. The ALJ's failure to comply with the requirements of the treating physician rule is a legal error warranting remand. *See Daley v. Berryhill*, No. 16 Civ. 2246, 2017 WL 4236566, at *2 (S.D.N.Y. Sept. 24, 2017); *Pines v. Colvin*, No. 13 Civ. 6850, 2015 WL 1381524, *5 (S.D.N.Y. March 25, 2015); *Rolon*, 994 F. Supp. 2d at 509. On remand, the ALJ should either obtain an independent review of the medical evidence or recontact Dr. Frucht for clarification to resolve any conflict in Dr. Frucht's opinion. The ALJ should then reevaluate Levine's RFC based on a proper evaluation of Dr. Frucht's opinion.

B.     The ALJ should Reconsider His Credibility Determination on Remand

Because the Court concludes that ALJ did not following the treating physician rule and remands on that basis, the Court need not reach Levine's other arguments. The Court will, however, discuss Levine's contention that the ALJ failed to attribute proper weight to his subjective complaints, to the extent that the ALJ's credibility assessment raises concerns that should be addressed on remand.

1.     Legal Standard for Credibility Determinations

It is within the ALJ's "discretion to evaluate the credibility of a claimant and to arrive at an independent judgment, in light of medical findings and other evidence, regarding

the true extent of the pain alleged by the claimant." *Aronis v. Barnhart*, No. 02 Civ. 7660, 2003 WL 22953167, at *6 (S.D.N.Y. Dec. 15, 2003) (quoting *Marcus v. Califano,* 615 F.2d 23, 27 (2d Cir. 1979)). In evaluating a claimant's own description of his impairments, an ALJ undertakes a two-step process. *See* 20 C.F.R. § 404.1529. At the first step, the ALJ determines whether the claimant suffers from a medically determinable impairment that could reasonably be expected to produce the symptoms alleged. *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010). If the claimant does suffer from such an impairment, at the second step, the ALJ evaluates "the intensity, persistence, and limiting effects of the individual's symptoms to determine the extent to which the symptoms limit the individual's ability to do basic work activities." SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996); *see also* 20 C.F.R. § 404.1529(c).

When assessing the credibility of a claimant's statements about the intensity, persistence, or functionally limiting effects of his symptoms, the ALJ considers the following types of evidence, in addition to any objective medical evidence that substantiates the claimant's statements:

> (1) The individual's daily activities; (2) the location, duration, frequency, and intensity of the individual's pain or other symptoms; (3) factors that precipitate and aggravate the symptoms; (4) the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; (6) any measures other than treatment the individual uses or has used to relieve pain or other symptoms (*e.g.*, lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and; (7) any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

SSR 96-7p, 1996 WL 374186, at *2. When the ALJ rejects a plaintiff's testimony in light of objective medical evidence and other factors he deems relevant, he must explain that

decision "with sufficient specificity to enable the [reviewing] Court to decide whether there are legitimate reasons for the ALJ's disbelief and whether his decision is supported by substantial evidence." *Calzada v. Asture*, 753 F. Supp. 2d 250, 280 (S.D.N.Y. 2010) (alteration in original) (quoting *Fox v. Astrue*, No. 05-CV-1599, 2008 WL 828078, at *12 (N.D.N.Y. March 26, 2008)); *see also Rosario v. Astrue*, No. 12 Civ. 3594, 2013 WL 3324299, at *8 (S.D.N.Y. June 25, 2013) (ALJ's credibility determination entitled to deference unless it is "not set forth with sufficient specificity" (quoting *Ferraris v. Heckler*, 728 F.2d 582, 587 (2d Cir.1984)).

### 2. Credibility Analysis

Here, the ALJ found that "from September 1, 2007 through December 31, 2010 [Levine] experienced some muscle stiffness, slowing, tremor and balance issues as a result of Parkinson's." (R. at 26.) The ALJ then went on to the second step to evaluate the credibility of Levine's statements concerning the intensity, persistence, and functionally limiting effects of these symptoms in light of the above-listed factors. Ultimately, the ALJ concluded that Levine's "allegations of his inability to work on a continued, sustained basis as a result of his functional limitations are not fully credible, as they are not entirely supported by the evidence of record." (R. at 25.)

In certain respects, the ALJ's analysis was sound. With regard to the effectiveness of Levine's treatment and the seriousness of his impairment, however, the ALJ largely restated many of the same faulty arguments he made in his assessment of Dr. Frucht's opinion. (R. at 27.) On remand, these assessments should be reconsidered in light of the weight accorded to Dr. Frucht. The ALJ also relied upon alleged discrepancies between Levine's claim of an "emotional impairment" and the way Levine presented

himself during the hearing as an additional reason for discounting Levine's complaints. (R. at 27.) The ALJ further noted that there was "minimal mention of psychiatric symptoms in the medical records." (R. at 27.) While it is accurate that Levine did not mention his depression on his disability application, the record contains numerous mentions of a mood disorder as well as prescriptions for drugs used to treat anxiety and depression. (*See, e.g.*, R. at 193, 195, 224, 228, 231, 244.) Moreover, Levine testified that he had seen two psychiatrists – Dr. Groves and Dr. Pepper – from whom the ALJ did not request any records. (R. at 52.) In light of the fact that the ALJ did not request these records, it was inappropriate for him to rely on their absence as evidence. *See, e.g.*, *Burton-Mann v. Colvin*, No. 15 Civ. 7392, 2016 WL 4367973, at *6 (S.D.N.Y. Aug. 13, 2016) (ALJ cannot rely upon the absence of treatment notes when the ALJ failed to obtain them); *Bushansky v. Commissioner of Social Security*, No. 13 Civ. 2574, 2014 WL 4746092, at *6 (S.D.N.Y. Sept. 24, 2014) (same). For these reasons, the ALJ should more thoroughly evaluate Levine's subjective complaints on remand.

## CONCLUSION

For the foregoing reasons, Plaintiff's motion is GRANTED and the Commissioner's motion is DENIED, and this matter is remanded to the Commissioner for further proceedings consistent with this opinion.


SO ORDERED.

_____
ROBERT W. LEHRBURGER
UNITED STATES MAGISTRATE JUDGE

Dated: September 4, 2018
      New York, New York

Copies transmitted this date to all counsel of record.